IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| GREGORY PHELPS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 5:13-cv-206 (MTT) (CHW) |
| | : | |
| CAROLYN W. COLVIN, | : | Social Security Appeal |
| Acting Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Gregory Phelps' application for benefits. In accordance with the analysis below, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**.

## BACKGROUND

Plaintiff filed an application for Title XVI benefits on March 18, 2010. (Pl.'s Br., Doc. 12, p. 3). At the time of filing, Plaintiff, who was born on July 7, 1962, was 47 years old. (*Id.*). Plaintiff claims to see and hear dead people. (R. 53-62). Plaintiff also suffers from headaches, is illiterate, and has a history of substance abuse. (R. 46, 57-58, 60).

The record indicates that Plaintiff previously received social security benefits due to mild mental retardation, but those benefits appear to have been terminated when Plaintiff was incarcerated for burglary in the 1980s.[1] (R. 39-42, 296). The administrative law judge ("ALJ") assigned to review Plaintiff's 2010 application summarized the sequence of events as follows at a hearing held on February 23, 2012:

---

[1] *See* 42 U.S.C. § 402(x)(1)(A)(i); 20 C.F.R. § 416.1335.

1

> [T]here was a Title XVI claim filed, application 3/12/1975. And there was a decision for an allowance and so that payment was from 7/17/1975 until March 18, 1986. And that was a date of incarceration is the way it looked like to me. There was another Title XVI application, 11/3/88 and that was denied at the initial level in 1989. And then there was an application, 7/3/2004 which was also denied at the initial level . . . .
>
> (R. 42)

Plaintiff's attorney, at Plaintiff's administrative hearing, asked the ALJ to obtain Plaintiff's prior claim files in the hopes of finding an IQ satisfying the requirements of Listing 12.05 ("Intellectual disability"), paragraphs B or C. (R. 41). The ALJ, however, in her unfavorable decision, determined that while "the earlier records might show a low IQ score as a child, this would not be evidence of current IQ functioning under the regulations." (R. 23). Plaintiff subsequently sought review before the Appeals Council, which denied review in Plaintiff's case on March 4, 2013. (R. 1-3). Plaintiff now seeks review before this Court under "sentence four" of 42 U.S.C. § 405(g). *Ingram v. Comm'r.*, 496 F.3d 1253 (11th Cir. 2007). She raises two grounds for relief (1) that the ALJ erred by failing to obtain Plaintiff's 1975 Title XVI claims files; and (2) that the ALJ improperly relied upon the opinion of Dr. Robbins-Brinson, a consultative examiner.

## STANDARD OF REVIEW

District courts have a limited role in reviewing claims brought under the Social Security Act. Review of the Commissioner's decision is restricted to a determination of whether the decision is supported by substantial evidence and whether the correct legal standards were applied. *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Consequently, a court's role in reviewing claims brought under the Social Security Act is quite narrow.

District courts must defer to the Commissioner's factual findings. Courts may not decide facts, re-weigh evidence, nor substitute their judgment for that of the Commissioner. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Credibility determinations are left to the Commissioner and not to the courts. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). *See also Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986). Courts must scrutinize the entire administrative record to determine the reasonableness of the Commissioner's factual findings. *Bloodsworth*, 703 F.2d at 1239. However, even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if it is supported by substantial evidence. *Id.*

The Commissioner's findings of law are given less deference. Courts must determine if the Commissioner applied the proper standards in reaching a decision. *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980). Courts must therefore consider any questions of law *de novo*, and "no . . . presumption of validity attaches to the [Commissioner's] conclusions of law, including determinations of the proper standards to be applied in reviewing claims." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982). The Commissioner's failure to apply the correct legal standards or to provide a sufficient factual basis for the court to determine that the correct legal standards have been followed is grounds for reversal. *Id.*

## EVALUATION OF DISABILITY

Persons are "disabled" for the purposes of receiving benefits under the Social Security Act if they are unable to engage in any substantial gainful activity due to a medically

3

determinable physical or mental impairment which is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A).

When evaluating a claimant's disability, the Commissioner follows a five-step "sequential evaluation procedure." 20 C.F.R. § 404.1520(a)(4)(i)-(v). At step one, the Commissioner determines whether the claimant currently engages in substantial gainful activity. At step two, the Commissioner considers the medical severity of the claimant's impairments. Next, at step three, the Commissioner determines whether the severity of the claimant's impairments (i) meet or equal the severity of one or more of the impairments specified in the listing of impairments; and (ii) meet the duration requirement. If so, the sequential evaluation procedure stops and the claimant is declared "disabled." If not, the Commissioner assesses the claimant's residual functional capacity, ("RFC"), which is defined as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). The Commissioner then proceeds to step four where, based on her RFC assessment, she evaluates the claimant's ability to return to past relevant work despite his or her medically-determinable impairments. Finally, at step five, the Commissioner determines whether there are a sufficient number of jobs in the national economy that the claimant can perform in light of his or her RFC, age, education, and work experience.

## DISABILITY EVALUATION IN PLAINTIFF'S CASE

Following the five-step sequential evaluation procedure, the reviewing ALJ made the following determinations in Plaintiff's case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since at least March 18, 2010, his application date. (R. 21). At step two, the ALJ found that Plaintiff had the following severe impairments: "depressive disorder NOS, psychotic disorder NOS, history of alcohol abuse, personality

disorder NOS and borderline intellectual functioning." (*Id.*). At step three, the ALJ found that Plaintiff's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21-24). Regarding Listing 12.05 in particular, the ALJ noted that Plaintiff: (a) did not satisfy the paragraph B criteria because he did "not have a valid verbal, performance, or full scale IQ of 59 or less;" and (b) did not satisfy the paragraph C criteria because he did "not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitations of function." (R. 23-24).

As a result of her step-three findings, the ALJ assessed Plaintiff's RFC and found he could perform:

> A full range of work at all exertional levels but with the following non-exertional limitations: The claimant requires simple, routine work consistent with a Specific Vocational Preparation of 1 or 2, and requiring only simple, work-related decisions. Furthermore, the claimant's work must be performed in an environment with few, if any, workplace changes. Moreover, the claimant can have no more than occasional contact with the general public, supervisors or co-workers.

(R. 24)

At step four, the ALJ noted that Plaintiff did not have any past relevant work. (R. 27). At step five, however, the ALJ determined that Plaintiff could make an adjustment to other work existing in significant numbers in the national economy. (R. 28). Specifically, the ALJ found that Plaintiff could perform the requirements of representative occupations such as "Kitchen Helper," "Hand Packer/Packager," and "Machine Feed Off-bearer." (*Id.*). Therefore, the ALJ found Plaintiff "not disabled" within the meaning of the Social Security Act.

## PLAINTIFF'S PRIOR CLAIM FILES

Plaintiff first argues that the ALJ erred by failing to obtain Plaintiff's 1975 Title XVI claim files which, Plaintiff argues, might have contained an IQ score satisfying paragraphs B or C of listing 12.05 ("Intellectual Disability"). Plaintiff cites the Hearings, Appeals, and Litigation Law Manual, or "HALLEX," in support of this argument.[2]

In her unfavorable opinion, the ALJ determined that while "the earlier records might show a low IQ score as a child, this would not be evidence of current IQ functioning under the regulations." (R. 23). Plaintiff claims that there is "no regulatory basis for this assertion," but Appendix 1 clearly establishes a limitations period for the validity of IQ scores based on a claimant's age:

> IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.
>
> 20 C.F.R. Part 404 Subpart P § 112.00 ("Mental Disorders")

Plaintiff was born on July 7, 1962, so he would have been thirteen at the time his Title XVI payments began in July 1975. According to Appendix 1's rubric, therefore, any IQ score Plaintiff used to successfully apply for benefits in 1975 would have become "invalid" by at least

---

[2] Plaintiff also cited *Hodges v. Barnhart*, 276 F.3d 1265 (11th Cir. 2001), but that case is of little authoritative value in this context. (Pl.'s Br., Doc. 12, p. 11). In *Hodges*, the Eleventh Circuit held that absent evidence of intervening traumatic injury, claimants who are intellectually disabled during their mature years are also presumed to have been intellectually disabled during their developing years. In this case, by contrast, Plaintiff seeks to use IQ scores from his developing years to establish his current disability under listing 12.05.

1979.[3] Because disability under paragraphs B and C of listing 12.05 requires a *valid* IQ score, and because any IQ score obtained from Plaintiff's 1975 claim files would not be valid, the ALJ's decision not to obtain those claim files was not an error. For the same reason, the ALJ's decision not to obtain the prior claim files could not have "prejudiced" Plaintiff, and as a result, Plaintiff is not entitled to a remand based on the ALJ's alleged violation of HALLEX procedure. *See, e.g., Tarver v. Astrue*, 2011 WL 206217 at *3 (S.D. Ala. 2011) (determining that "remand is mandated only when the ALJ violates the procedures in the HALLEX . . . and [only when] that violation prejudices the claimant"); *see also George v. Astrue*, 338 Fed. App'x 803, 805 (11th Cir. 2009) (noting that the question of whether HALLEX "carries the force of law" has not been answered by the Eleventh Circuit).

## DR. ROBBINS-BRINSON'S OPINION

Plaintiff's second ground for relief involves the opinion of Dr. Robbins-Brinson, a consultative examiner who found that Plaintiff suffered from "borderline intellectual functioning," (R. 299), as opposed to full-fledged intellectual disability. Plaintiff argues that the ALJ "improperly relied upon" Dr. Robbins-Brinson's opinion because, according to Plaintiff, three categories of evidence cited by Dr. Robbins-Brinson to support her conclusions do not, in fact, support those conclusions. (Pl.'s Br., Doc. 12, p. 12). Those three categories of evidence are: (i) activities of daily living, (ii) work history, and (iii) prior functional evaluations. (*Id.*).

Plaintiff appears to argue that Dr. Robbins-Brinson's opinion was "so patently deficient" that the ALJ erred simply by relying upon it.[4] *See Nyberg v. Comm'r of Soc. Sec.*, 179 Fed.

---

[3] Plaintiff does not appear to allege that claim files from unsuccessful applications in 1988 and 2004 contain valid IQ scores that might satisfy paragraphs B or C of listing 12.05. (R. 42).

[4] *See*, *e.g.*, (Doc. 12, p. 13) ("the consultative examiner's report . . . is not consistent with the evidence cited"); (*Id.*) ("the ALJ's reliance upon Dr. Robbins-Brinson's unsupported conclusions is inherently flawed"); (Doc. 15, p. 6) ("Dr. Brinson asserted that Mr. Phelps' functioned at the borderline level based upon his daily

App'x 589, 592 n.5 (11th Cir. 2006) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)). As neither the Court nor ALJs are qualified to make medical determinations, however, success on such a claim necessarily requires a manifest error on the part of the "acceptable medical source." 20 C.F.R. § 404.1527.

Contrary to Plaintiff's arguments, it is not clear from the record that Dr. Robbins-Brinson manifestly erred in determining that Plaintiff's activities of daily living, work history, and prior functional evaluations all supported a diagnosis of mere borderline intellectual functioning, as opposed to full-fledged intellectual disability. Dr. Robbins-Brinson administered the Wechsler Adult Intelligence Scale-IV examination, which yielded a full scale IQ result of 53. Dr. Robbins-Brinson did not consider the test result to be valid, however, because Plaintiff "did not attempt several subtests or put forth little to no effort." R. 297. Regarding (i) activities of daily living, Dr. Robbins-Brinson found that Plaintiff was responsible for household chores like taking out the trash and cleaning up, and that Plaintiff participated in "church-related organized social and recreational activities." (R. 297). The record supports Dr. Robbins-Brinson's findings. *See*, *e.g.*, (R. 55) ("I get along with people fine"). Regarding (ii) Plaintiff's work history, Dr. Robbins-Brinson noted that Plaintiff was fired from his fast-food job due to illiteracy, and that Plaintiff quit a part-time job due to dissatisfaction with his pay. (R. 297). In neither case was Plaintiff precluded from working due to his alleged intellectual impairments. (*Id.*). Finally, regarding (iii) prior functional evaluations, Dr. Robbins-Brinson determined that Plaintiff previously "presented his skills and abilities with much higher functioning." (R. 299).

The record as a whole supports Dr. Robbins-Brinson's determination. Plaintiff's treatment records consist largely of records from the Georgia Department of Corrections for

---

activities, work history, and prior evaluations[, but those categories of evidence] showed that Mr. Phelps had much higher functioning").

treatment during periods of incarceration and records from River Edge Behavioral Health Center for treatment after his release from prison. In prison, Plaintiff's mental health treatment was focused on a schizoaffective or psychotic disorder connected to past reports of auditory or visual hallucinations, for which he was prescribed Geodon. He was also treated for depression or anxiety, for which he was prescribed Lexapro or Prozac. An intake evaluation on December 19, 2007, diagnosed Plaintiff with Atypical Psychotic Disorder and Borderline Intellectual Functioning. R 385. A checklist attached to that intake evaluation noted "poor" judgement and insight, "below average" impulse control, and "possible retardation," but also noted "no notable impairment" to memory, "cooperative" interaction with the examiner, "logical/coherent" thought processes, and normal tone of voice, rate of speech, manner of speech, and speech content. R. 292. *See. also.*, R. 388–89 (no diagnosis on Axis III; "Organized" thought process); R. 391-92 ("remote TBI" on Axis III; "Organized thought process); R. 398 ("This IM may be fine off MH"). The records from the Department of Corrections do not include results from any formal IQ tests or other tests of intellectual functioning.

At River Edge, Plaintiff sought treatment primarily for past substance abuse problems. Plaintiff did continue to report some depression and auditory or visual hallucinations. The records indicate that Plaintiff was treated with risperidone and trazodone for these conditions. The River Edge records include an Axis II diagnosis of "Mild Mental Retardation" (R. 333), but do not include results from any formal IQ tests or other tests of intellectual functioning.

The available records—including treatment records from the Department of Corrections and River Edge, Dr. Robbins-Brinson's evaluation, and the transcript of the ALJ hearing—all indicate that Plaintiff was able to communicate and interact functionally with others.

As such, substantial evidence in the record supports Dr. Robbins-Brinson's conclusion that Plaintiff's activities of daily living, work history, and prior functional evaluations all supported a diagnosis of mere borderline intellectual functioning, as opposed to full-fledged intellectual disability. As a result, there is no basis for this Court to conclude that the ALJ erred simply by assigning "great evidentiary weight" to Dr. Robbins-Brinson's opinion. (R. 27).

## CONCLUSION

After careful consideration of the record, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the District Judge to whom this case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

**SO RECOMMENDED**, this 5th day of August, 2014.

                                                        s/ Charles H. Weigle_____
                                                        Charles H. Weigle
                                                        United States Magistrate Judge